## Symons, Jr., Appellant, v. National Electric Products, Inc.

506

Argued March 18, 1964.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Myron E. Rowley,* with him *Ralph E. Smith, James E. Rowley,* and *Rowley, Smith & Rowley,* for appellant.

*Clem R. Kyle,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, June 1, 1964:

This is an appeal by a claimant from an order of the Workmen's Compensation Board suspending compensation. The order was affirmed by the Court of Common Pleas of Beaver County and per curiam by the Superior Court on the opinion of the court below.

The essential facts are not in dispute. On August 21, 1952, Richard C. Symons, Jr., was at work in Ambridge, Pennsylvania, as a molding machine operator when he met with an accident. He suffered a crushing type injury which immediately caused a compound fracture of both legs. This compelled the amputation of both legs at points above each knee. Claimant was twenty-nine years of age at the time.

Prior to the accident, claimant had been earning an average wage of $76.61 per week. Section 306(a) of the Workmen's Compensation Act of 1915, June 2, P. L. 736, as amended to the date of the accident, 77 P.S. §511,[1] granted (in the then effective schedule)

---

[1] Further amendments to the Act have since been added, particularly with reference to the compensation schedule. All references to the rate of compensation, therefore, will be to the Act at the time of the accident. However, unless specifically noted, other material portions of the Act have remained substantially unchanged.

compensation for total disability at a maximum of $30 per week, but not to exceed two-thirds of claimant's prior wage, payable for a maximum period of 700 weeks (after a waiting period of seven days following the accident).

Accordingly, after the accident, the parties entered into a workmen's compensation agreement, providing for payment of compensation at $30 per week. This amount was paid for 430 weeks from August 28, 1952 (one week after the accident), until November 23, 1960. However, during this time, claimant participated in a remarkable rehabilitation program which was a cooperative undertaking by claimant and the workmen's compensation carrier for the employer.

After preliminary discussion with claimant to determine his suitability as a candidate for industrial rehabilitation from the viewpoint of interest and mental attitude, defendant's carrier brought claimant to its rehabilitation center in Boston in November of 1952. Rehabilitation efforts there included both psychological preparation and extensive physical treatment, training and guidance by orthopedists, physical therapists and occupational therapists to assist claimant in compensating for his devastating physical handicap. Claimant was initially given boots in each of which was incorporated an articulating or movable foot to increase their utility. He was trained in the use of these initial prosthetic devices during his first stay at the center, which lasted until February, 1953, and "he became extremely agile" and "self-sufficient in the use of these boots." He returned to the rehabilitation clinic in September, 1953, and obtained new prostheses in the form of full-length artificial legs.[2]

---

[2] The carrier calculated its total cost in the work of the rehabilitation center for claimant, including the actual medical costs, prosthesis, transportation and hotel housing at $3,883.48. With the original medical and hospital costs, the total associated expense amounted to $6,803.33.

Claimant succeeded in adapting himself to his severe handicap and resumed employment with defendant on January 28, 1954. He was given a job as inspector in defendant's wire and cable division, the duties of the job being: "Under supervision to inspect wire and cable in various stages of process; to interpret specification charts and detailed drawings; to inspect material and processes on the following equipment: tube insulators, stranders, bunchers, and similar types of equipment; to check the following when applicable against physical specification requirements: diameter of copper, number of strands, diameter overall; thickness of insulation; length and direction of lay, copper and conductor or tape."[3]

Defendant's personnel manager testified that this work required "limited phsyical effort," but "continuous visual attention and mental alertness." The "fatigue factor" was not great, since the work involved "light handling, not continuous." However, this was not an artificially created job, intended simply to give claimant some form of work. To the contrary, this very job classification was in existence prior to the time he handled it and was performed by other employees. The same witness testified that claimant performs his work "without any undue or unreasonable assistance," he does not receive any more assistance than any other inspector, and claimant has "a very good work record. . . . His record indicates in all factors of quality, quantity, etc., he has been conscientous and has done a good job." Claimant's job is not temporary, but is likely to continue. He works a regular weekly period of five days at eight hours per day. He drives his own automobile to work, places it in a park-

---

[3] In the words of defendant's assistant personnel manager. The other descriptions of claimant's present job are also from this witness's testimony.

ing space at the plant, and from that parking area walks to his job without assistance.

Although at the time of the accident claimant was earning a wage of $1.54 per hour, as of the date of the hearing before the referee (October 18, 1961), the wage for his former job was $1.98 per hour. However, the job as inspector, which claimant is successfully able to perform and at which he earns his wages, pays considerably more. From his initial rate on January 28, 1954, of $1.82 per hour, he received five increases, the last four all reaching amounts higher than even the increased molding machine operator's rate in force at the time of the hearing. For four years prior to the hearing (since September, 1957), claimant had been earning wages at the rate of $2.275 per hour, or $ .735 per hour higher than his wage at the time of the accident.[4]

Defendant continued to pay workmen's compensation to claimant under the original agreement at the maximum rate of $30 per week in accordance with the Act, even after claimant returned to work in 1954. These payments were continued until November 23, 1960, which was the date of expiration of the 430 week period.

Under Section 306(c) of the Act (77 P.S. §513), the loss of one leg entitles a claimant to 215 weeks of compensation.[5] Hence, defendant reasoned that the loss of two legs would entitle the claimant here to payment for twice that period, or 430 weeks, which was in fact paid. Claimant received total compensation payments, aside from the medical and hospital care cost and the

---

[4] As a matter of interest, it is also $ .295 higher than the increased rate for a molding machine operator as of the time of the hearing.

[5] This provision of the Act is the same at the present time as it was in 1952.

further cost of rehabilitation at the clinic, in the amount of $12,900.

Defendant then filed a petition *to suspend* further payment, rather than a petition *to terminate*. The theory of the petition was that claimant regularly had been earning sums in excess of his wages at the time of the accident and that having been paid all the compensation provided under the specific schedule set forth in Section 306(c) for the loss of two legs, he was entitled to no further compensation unless disability extended beyond the loss of two legs and is to be considered total under a further provision of Section 306(c). That provision states: *"Unless the board shall otherwise determine,* the loss of both hands or both arms or both feet or both legs or both eyes shall constitute total disability to be compensated according to the provisions of clause (a)."[6] (Emphasis supplied.)

For total disability, the Act in Section 306(a) provided for the payment of a maximum of 700 weeks of compensation not to "exceed in the aggregate the sum of twenty thousand dollars."[7] Section 306(d) (77 P.S. §513) then provided that the period of payment of compensation for total disability and the specific periods for the losses mentioned in clause (c) shall run concurrently.

The workmen's compensation referee, after taking testimony, found that because of the loss of both legs, claimant was totally disabled. It is to be noted that claimant was not represented by counsel before the referee, but the referee, as a reading of the record clearly discloses, carefully protected claimant's rights. In view of the substantial agreement as to facts between the parties, there is nothing to suggest that the presence of counsel would have resulted in the production

---

[6] This provision has remained unchanged.

[7] The rate and time of compensation have been changed substantially since the date of the accident.

of testimony which would have changed the subsequent findings in the case.[8] (On the appeal to the workmen's compensation board and in the later proceedings before the common pleas and Superior Courts, claimant was very ably represented by counsel.)

The referee specifically found as a fact that "Successful rehabilitation measures enable this claimant to return to his regular work on 1-28-54, where he has been working ever since without loss of wages." In his third finding, the referee concluded, ". . . although the claimant has been successfully rehabilitated, the loss of both legs constitutes total disability." Accordingly, in his conclusion of law, the referee ruled ". . . that the defendants are not entitled to a suspension of compensation payments as prayed for."

The board vacated the referee's third finding of fact and substituted the following: "THIRD: We find that the claimant has been successfully rehabilitated and has resumed work for the defendant at wages in excess of those received by him at the time of the accident.

"FOURTH: We find that the claimant is not totally disabled at this time."

The substituted conclusion of law entered by the board reads: "Since the claimant is not totally disabled, the defendant is entitled to an order of suspension of compensation benefits."

Based upon the foregoing changes in the findings of fact and conclusions of law, compensation was suspended by the board, effective November 24, 1960, at which time the 430 week period had terminated.

Claimant filed an appeal with the Court of Common Pleas of Beaver County. That court, in a comprehensive opinion by the late President Judge MC-CREARY, dismissed the appeal and affirmed the order

---

[8] Nowhere does claimant raise an issue as to the absence of counsel at the hearing.

of the board ". . . suspending compensation for total disability as of November 24, 1960, until such time as disability is reflected in a loss of earning power . . . ."

On further appeal by claimant to the Superior Court, that court again sustained the suspension and unanimously affirmed "on the able opinion" of the court below. This Court granted allocatur.

The basic issue is whether, under the provisions of Section 306(c) of the Workmen's Compensation Act, the board was justified in suspending the further payment of compensation (for asserted total disability) after claimant had been paid in full for the loss of both legs and was thereafter earning wages in excess of those earned at the time of the accident.

Section 306(c) provides that "the loss of . . . both legs . . . shall constitute total disability to be compensated according to the provisions of clause (a)." However, these words are preceded by the limitation, "unless the board shall otherwise determine." Hence, it was the legislative intention and direction that the board might find that even in the event of a double amputation, a claimant might not be entitled to compensation for total disability.

The Statutory Construction Act, May 28, 1937, P. L. 1019, as amended, 46 P.S. §§501-602, includes the following guidelines: "In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others: . . . . (2) That the Legislature intends the entire statute to be effective and certain; . . . ." §52, 46 P.S. §552.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Every law shall be construed, if possible, to give effect to all its provisions.

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded

under the pretext of pursuing its spirit." §51, 46 P.S. §551.

To accept appellant's theory in this case that the loss of both legs entitled him to the continued payment of compensation for total disability despite the fact that the board determined otherwise on the evidence before it would require us to ignore the legislative language "unless the board shall otherwise determine" as well as to violate the rules of statutory construction. Under the instant facts, the board has exercised its discretion and has "otherwise determined" that a double amputee who has been so far rehabilitated that he is able to earn more than his pre-accident wages is not totally disabled.

It is to be noted that for all the other losses enumerated in Section 306(c), compensation is to be paid for stated periods without any discretion in the board. It is only in the sub-section dealing with "the loss of both hands or both arms or both feet or both legs or both eyes" that the introductory phrase "unless the board shall otherwise determine" appears. This statutory language clearly vests with the board the authority to decide whether, in this area of specific losses, the factual circumstances establish the absence of total disability.

The findings of fact of the board are conclusive on appeal; the board will be reversed only if there is no evidence to support its findings. "The extent of physical disability is a complex factual matter dependent upon many variables, and the determination of this question is within the province of the compensation authorities: Finch v. Jones & Laughlin Steel Corp., 198 Pa. Superior Ct. 389, 181 A. 2d 706, as is also the question of the credibility of the witnesses and the weight of their testimony: Lind v. Argo Lamp Co., 198 Superior Ct. 247, 181 A. 2d 726." *Bobbouine v. Rex Shoe Co.*, 200 Pa. Superior Ct. 273, 276, 188 A. 2d 848,

850 (1963). Accord, *Chernetsky v. William Penn
Stripping Co.,* 200 Pa. Superior Ct. 277, 188 A. 2d 770
(1963); see *Holt v. Sunray Electric, Inc.,* 186 Pa. Su-
perior Ct. 594, 142 A. 2d 509 (1958); *Hollenbach v.
North Wales Foundry Co., Inc.,* 184 Pa. Superior Ct.
571, 136 A. 2d 148 (1957).

Appellant seeks reversal of the courts below on the
basis of the decisions in *Rutledge v. Daley's Blue Line
Transfer Co.,* 152 Pa. Superior Ct. 118, 31 A. 2d 366
(1943), and *Shoop v. Chambersburg Baking Co.,* 189
Pa. Superior Ct. 20, 149 A. 2d 179 (1959).

In the *Rutledge* case, claimant likewise suffered a
double amputation of the legs. Two additional am-
putations on each had to be performed after the initial
operation, ". . . and the medical testimony indicates
that further amputation of each will probably be nec-
essary. Claimant has been fitted with artificial feet,
and walks with difficulty, in a stooped position, with
the aid of two canes." 152 Pa. Superior Ct. at 119, 31
A. 2d at 367.

The board in *Rutledge,* unlike the present situation,
found that claimant's double amputation did represent
total disability. Thus, that case did not come within
the discretionary exception contained in the portion of
Section 306(c) on total disability. In affirming the
conclusion of the board, the Superior Court recognized
that the board had the authority to decide whether
such loss, on the evidence presented, was other than a
permanent total disability. "The disabling effects
caused by the amputation of two feet, etc., are perma-
nent and do not cease or change with lapse of time;
and when declared by the legislature to constitute to-
tal disability, it necessarily remained so, *at least until
determined otherwise by the board. . . .* The board has
not determined otherwise in this case." *Rutledge v.
Daley's Blue Line Transfer Co.,* 152 Pa. Superior Ct.
118, 122-23, 31 A. 2d 366, 368 (1943). (Emphasis sup-
plied.)

In the *Shoop* case, the employer filed a petition for *termination* (not suspension) of compensation on the theory that since claimant, after numerous jobs, had found a position paying more than he earned at the time of the accident, he was no longer totally and permanently disabled. The referee and the board found to the contrary, that the amputation of claimant's legs did represent total disability. On appeal to the Court of Common Pleas of Franklin County, the decision was reversed. However, the Superior Court in turn reversed the court of common pleas and reinstated compensation.

The *Shoop* decision is distinguishable from the case at bar. The board, on the facts before it, refused to "otherwise determine" and to find that claimant was not totally disabled. In the absence of a determination by the board to the contrary, the total disability continued with respect to payment of workmen's compensation. Here, however, the board has made the contrary factual finding. In view of the degree of finality which must be accorded to the board's findings, as previously indicated, we cannot reverse those findings where there is evidence to sustain them.

Although it may be argued that the board cannot find other than total disability where there is a loss of both legs, such argument flies directly in the face of the language of §306(c) that the loss constitutes total disability *"unless the board shall otherwise determine."* The Legislature has vested a discretionary power in the board. That discretion may be removed or diminished only by the Legislature.

It is significant that the Superior Court which decided the *Shoop* case found nothing inconsistent in affirming, per curiam, the decision of the board in the instant case on the basis of the board's exercise of its clearly stated discretion.

Appellant further suggests that the determination as to the extent of disability must be made immediate-

ly after the occurrence of the accident and that no attention or effect should be given to changes occurring thereafter. Such a rule would result in great injustice to the employee who, at the time of the accident, appears unhurt but later becomes disabled as a direct result thereof.

The argument by appellant that an adverse decision penalizes him for his cooperation and industry in seeking and achieving rehabilitation fails to recognize that claimant's compensation is governed by the statute rather than by such policy considerations. Furthermore, it would indeed be a rare claimant who would intentionally reject rehabilitation in order to receive disability payments of a comparatively small amount, as against receiving all the physical and psychological benefits of rehabilitation with subsequent earned wages not only far in excess of the amount provided under the statute, but, in this case, also in excess of his pre-accident wages.

Were a question of policy to apply, the employer should not be penalized for the many thousands of dollars spent in rehabilitation by being told that despite the successful rehabilitation, compensation payments will not be suspended. Such a policy would substantially discourage further large investments by workmen's compensation carriers in such rehabilitation efforts in the future.

Both claimant and the insurance carrier are to be commended on the excellent cooperation so encouragingly manifested in the rehabilitation project. They are to be praised for the results obtained in returning claimant to useful, valuable work and earning ability with the psychological and social benefits which result therefrom.

Since the order here is one of suspension, not of termination, the compensation authorities will retain jurisdiction in the eventuality that there occurs a change in claimant's present status. Should there be such a

change, the board will determine whether claimant is entitled to the remaining portion of the 700 weekly payments in effect at the time of the accident which he has not yet received.

Order affirmed.

Mr. Justice MUSMANNO dissents.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Section 306(c) provides that "the loss of . . . both legs . . . shall constitute total disability" unless the Board shall otherwise determine.

I do not agree that the Board may make that determination by relying solely on the wages earned now and those earned before the accident. There are so many variables that must be evaluated in making the determination of total disability that present earnings in contrast to the earnings at the time of the accident afford an inaccurate appraisement of total disability.

The majority's reliance on the earnings of the claimant in deciding whether claimant is or is not totally disabled is too rigid a construction to place on an act that requires a liberal interpretation. I would remand this case to the referee so that a proper record could be made which would take into consideration the many factors other than the relationship between the present earnings and the earnings at the time of the accident. See *Unora v. Glen Alden Coal Company*, 377 Pa. 7, 104 A. 2d 104 (1954).

Mr. Justice JONES joins in this dissenting opinion.